### BERNARDINO GONZALES v. THE STATE.

*No. 3223.     Decided November 2.*

**1.  Express Malice.**—Charge of the Court defines express malice as follows: "Express malice is when a man with a cool and sedate mind, in pursuance of a formed design to kill another, or to inflict upon him some serious bodily injury which would probably end in depriving him of life, does kill such person." *Held*, incomplete and materially insufficient.

**2.  Same—Self-Defense.**—Charging the jury as to self-defense the court instructed them that to justify the killing it must have taken place while the deceased was in the act of committing murder or maiming, or after some act done by him showing *evidently* an intention to commit such offense. The objection urged to this charge is based upon the use of the word "evidently." *Held*, that the word is statutory, and that the objection is without merit.

**3.  Same.**—The charge of the court upon the issue of self-defense, in so far as it determines the right of the slayer to act upon apparent danger, is insufficient, in that it does not distinctly direct the jury that the danger must be judged of from the slayer's standpoint and from no other, and from all the circumstances proved. See the opinion for such a charge on the subject as, under the proof, should have been given in this case.

**4.  Same—Threats.**—The charge of the court on self-defense, with respect to threats as bearing upon that issue, requires that in order to constitute justification the deceased, at the time of the homicide, manifested an intention then and there by words or gestures to execute the threats so made. *Held*, insufficient. The charge should have further required it to appear that the deceased, at the time of the homicide, did

some act which was reasonably calculated, in view of all the circumstances of the case, to produce in the mind of the defendant the belief that the deceased was then about to execute the threat. A special charge harmonizing with this rule was erroneously refused. The charge of the court is otherwise insufficient, inasmuch as it restricts to threats, and does not apply to the whole issue of self-defense, the doctrine that the defendant was not bound to retreat in order to avoid the necessity of killing his adversary.

5. **Same—Mutual Combat.**—See the opinion *in extenso* for a charge of the court upon the question of mutual combat, *held* erroneous as applied to the facts of this case, because its effect is to deprive the defendant, without reference to his intent, entirely of his right of self-defense if the killing was brought about by his own wrongful act. The rule is in such cases, that if the wrongful act was unaccompanied by any intent on the part of defendant to kill or seriously injure the deceased, or to commit any felony, such wrongful act would not deprive the defendant entirely of the right of self-defense, and would not necessarily render the homicide murder, but might reduce it to manslaughter, notwithstanding such wrongful act. Note also the ruling to the effect that even if it be conceded that the proof in this case demanded a charge upon mutual combat, and that the charge as given is correct as far as it goes, yet to be sufficient it should have further instructed the jury that although the defendant engaged voluntarily in the combat, yet if he did so under the influence of sudden passion arising from an adequate cause, it would not be murder, but manslaughter.

6. **Practice—Evidence.**—The recently enacted statute qualifying a defendant to testify in his own behalf, in nowise abrogates or changes the rules relating to declarations by a defendant, and can not be construed to qualify as evidence for a defendant his declarations which are not otherwise *res gestæ*. The trial court therefore did not err in refusing to permit the defense to prove the declarations of the defendant about the homicide, made an hour after the homicide occurred.

APPEAL from the District Court of Webb, on change of venue from Zapata. Tried below before Hon. J. C. Russell.

The conviction was in the first degree for the murder of Alejandro Vidaurri, and the penalty assessed by the verdict was a life term in the penitentiary.

The statement of facts covers over thirty pages of the transcript, but disregarding, for the purpose of convenience, the order in which the witnesses testified, the evidence on the trial may be summarized as follows:

The homicide occurred on the 17th day of February, 1889, in the pasture of one Bruni, in Zapata County. The defendant was an employe of Bruni, and also, at the time of the homicide, one of the posse of a "customs guard" under the command of A. C. Grimes and Victor Morel. The said guard at the time of the homicide was in the said pasture to examine into the status of a drove of horses in the possession of Alejandro Vidaurri, the deceased. The parties present at the time of the homicide besides the defendant and the deceased were Grimes, Garza, Rodriguez, and a Mexican boy. Grimes and the boy were the two eye-witnesses who testified for the State.

The boy testified, in substance, that he was present when the deceased joined Grimes, Garza, and Rodriguez at the place in Bruni's pasture where they had the stock in charge. Vidaurri, addressing Grimes, said,

"With your permission I will drive these cattle." Mr. Grimes then asked Vidaurri about the stock. After the conversation between Grimes and Vidaurri, the defendant, referring to other stock, asked Vidaurri why he branded "those calves." Vidaurri replied that he branded them because they belonged to him. Defendant replied that they did not belong to him. Vidaurri said, "All right; we will see about that according to law." Defendant replied that there was no law for him, Vidaurri. Vidaurri said, "All right; I will see about it." Defendant repeated that there was no law for him, and suddenly produced his pistol and fired, shooting Vidaurri, who fell from his horse. Defendant then rode in a half circle about the body with his pistol in his hand. The ball struck Vidaurri on the right side of the neck. Vidaurri reined up his horse just before the fatal shot was fired. He did nothing else, and made no remark other than those repeated by witness. Witness was positive that Vidaurri made no effort to draw a weapon at any time during the conversation which preceded the shooting.

A. C. Grimes testified for the State, in substance, that when Vidaurri joined his party in the pasture he, Grimes, asked him who owned the stock of horses. Vidaurri explained that he did not understand the English language. Witness then directed Garza to interpret for him. In reply to the question repeated in Spanish by Garza, Vidaurri, according to the interpreter, replied that the horses belonged to him. Witness then required Garza to ask him for his title papers. He replied through the interpreter that he did not have the papers, but that the man from whom he had bought the horses had gone to Laredo to get them and would soon be back. He then showed a disposition to leave, but witness, through Garza, directed him to remain until Mr. Morel, who had separated from the party, should come up. The conversation between the witness and Vidaurri closing at this point, defendant spoke to Vidaurri in Spanish. Vidaurri replied in Spanish, and in such manner as to indicate to witness that he was indignant. Defendant spoke again, and witness saw that Vidaurri became angry. Witness did not understand the Spanish language, but thought from the manner of the parties that a row was imminent; he attempted to stop it. Vidaurri spurred his horse ahead of witness's horse. Witness then looked back at defendant. At that moment defendant spurred his horse up, and suddenly jerked out his pistol and fired the fatal shot. The witness did not see Vidaurri at the moment the shot was fired, and did not know what he was then doing. Vidaurri's horse ran off after the shooting, but was soon brought back. Witness did not particularly observe Vidaurri's clothes, but he did see that Vidaurri's belt was full of cartridges. Defendant did not ride around or about the body after Vidaurri fell; on the contrary, he immediately returned his pistol to the scabbard and

remained stationary on his horse at the point from which he fired the fatal shot.

Victor Morel was the next witness. He stated that he reached the pasture a few minutes after the shooting. Soon afterwards one Salvador Cuellar and a brother of the deceased arrived, bringing back the horse of the deceased, which had run off after the shot was fired. An empty carbine scabbard was attached to the saddle on the left hand side. The State closed.

Andres Garza was the first witness for the defense. He testified, in substance, that he was one of the "customs guard," and was present at the homicide. When the deceased joined the party in the pasture, Mr. Grimes spoke to him, and he replied that he did not understand English. Grimes then directed witness to ask him in Spanish who owned or claimed the horses. The witness told Grimes that the deceased could both speak and write the English language fluently. Grimes replied to witness, "It makes no difference; ask him." Witness asked the question in Spanish, and deceased replied that the horses belonged to him. By Grimes's direction witness then asked deceased if he had the necessary title papers. Deceased replied that he did not have them, but that the man from whom he had purchased the stock had gone to Laredo to get them. Deceased then started toward the horses, but was ordered by Grimes, through witness, not to move them. The defendant then asked deceased why, if he held the stock in good faith, he had put them in the pasture, which belonged to Bruni. Replying, the deceased applied a vulgar epithet to defendant, and said, "You don't command here." Defendant then said to deceased, "There are two calves here that belong to Bruni with your brand on them. What right had you to brand those calves?" Deceased replied, "I will put my brand on Bruni's calves, and if you and Bruni will turn into cows I will brand you, too." At that instant the deceased, who was sitting on his horse, threw his right arm across his breast toward the left side of his horse. Defendant drew his pistol and fired the fatal shot. The movement of the deceased's arm was rapid, and made immediately before defendant drew his pistol. On receiving the shot the deceased fell from his horse, and the horse ran off. Witness did not see the left side of the horse until he was brought back, at which time he saw an empty carbine scabbard attached to the saddle on the left hand side. The witness was present in January, 1889, when Evaristo Rodriguez told the defendant that he, Rodriguez, detected the deceased branding one of Bruni's calves, on which occasion deceased said to him, Rodriguez, "Keep quiet; I will give you ten dollars a month more than you are getting from Bruni if you will work for me; and by putting Bernardino Gonzales (defendant) out of the way, we can get all the cattle we want right here." On his cross-examination this witness stated that deceased was in the habit of carrying a winchester carbine, and that the cartridges in the

belt around his body at the time he was killed were cartridges of a 44-calibre winchester carbine.

Francisco Guzman testified for the defense that he had the horses in charge about one hundred yards from the place of the homicide at the time the homicide occurred. Soon after the fatal shot was fired the deceased's horse, running away, passed the witness, and the witness, who was on the left hand side of the road, saw a carbine in the scabbard on the left hand side of the horse. The scabbard was empty when the horse was brought back a short while later.

The narrative of Evaristo Rodriguez, the next witness for the defense, was substantially the same as that of Garza, except that according to this witness the threatening movement of the deceased's hand and the pulling of the pistol by the defendant occurred about the same time. The movement of the arm by the deceased was evidently designed to draw a weapon, or, if not, to frighten the defendant. This witness further testified that hard feeling existed between defendant and deceased because of a previous "cow transaction." Defendant, witness being with him, found some of Bruni's cows in the possession of the deceased and took them away from him.

Alejo Torres testified for the defense that he was present on the occasion referred to by Rodriguez when some of Bruni's cattle were taken away from the deceased. Witness, who was the constable and was acting under warrant, and the defendant remained at the house with deceased while Rodriguez and others went after the cows. Witness observed a carbine standing in deceased's house and observed the efforts of deceased to approach and seize it. Witness then told the deceased that he must not touch the carbine. Deceased, speaking to defendant, said, "You ought to have come here alone. If you had I would have done you up."

Salvador Cuellar, the grandfather of the deceased, testified for the State that he saw the deceased when he left home on the morning of the homicide, and that he took no arms with him, either on his person or on his horse. His carbine was in his house at the time of his death. To contradict this testimony the defense recalled Alejo Torres, who testified that he reached the body just before the arrival of Salvador Cuellar and Basilio Vidaurri with the deceased's horse. When witness lifted up the body Cuellar asked him what had become of the deceased's carbine. Witness replied that he had just arrived and did not know. Cuellar then said that perhaps the men who killed him had also robbed him.

*Nicholson & Dodd,* for appellant.

*W. L. Davidson,* Assistant Attorney-General, for the State.

WILLSON, JUDGE. — 1. In the charge of the court express malice is defined as follows: "Express malice is when a man with a cool and sedate mind, in pursuance of à formed design to kill another, or to inflict upon him some serious bodily injury which would probably end in depriving him of life, does kill such person." This definition is incomplete and materially insufficient. It would embrace excusable and justifiable homicide. Cahn v. The State, 27 Texas Ct. App., 709; Crook v. The State, Id., 198.

2. Upon the issue of self-defense the jury are told in paragraph 8 of the charge that to justify the killing it must have taken place while the deceased was in the act of committing murder or maiming, or after some act done by him showing *evidently* an intention to commit such offense. Counsel for the defendant object to the use of the word "evidently" in this paragraph. It is the word used in the statute, and the objection is not maintainable. Penal Code, art. 570, subdiv. 2.

But there are objections to the charge on self-defense which, in our opinion, are sound ones. Upon this issue the charge is, to our minds, not as clear, comprehensive, and complete as it should have been. In explaining the rule as to *apparent* danger, it does not distinctly direct the jury that the danger must be judged of from the defendant's standpoint, and no other, and from all the circumstances proved. While the charge undertakes to present this principle of the law, it falls short, we think, of presenting it clearly, affirmatively, and accurately. Minds uneducated in the nice distinctions of the law would not be likely to discover in the charge the well established rules relating to apparent danger. These rules should have been presented so plainly and appositely to the evidence as that the jury could not reasonably have overlooked or misunderstood them. The jury should have been told that if, at the time the defendant fired the fatal shot, it reasonably appeared to him from the circumstances of the case, viewed from his standpoint, that the deceased was then about to shoot him with a gun or pistol, he was justified in killing the deceased, although in fact they might believe from the evidence that the defendant was in no danger at the time of being shot by the deceased.

Again, we think the charge on self-defense is not sufficiently full and accurate with respect to threats as bearing upon that issue. Counsel for defendant requested an instruction upon this phase of the case, which, in our judgment, should have been given. It presents the law as to threats fully, affirmatively, and correctly. In the charge as given in relation to threats, it is required, in order to constitute justification, that the deceased, at the time of the homicide, manifested an intention then and there by words or gestures to execute the threats so made. The instruction should have gone further and stated that if the deceased, at the time of the homicide, did some act which was reasonably calculated, in

view of all the circumstances of the case, to produce in the mind of the defendant the belief that the deceased was then about to execute the threat, the defendant would be justified in acting upon such appearance of danger.

Again, as a part of the law of self-defense, and applicable to all phases of it, the jury should have been told that the defendant was not bound to retreat in order to avoid the necessity of killing his assailant. This instruction is in the charge, but it is in the paragraph relating to the law as to threats, and is apparently restricted to that issue.

3. In the charge given to the jury is the following instruction: "If you find from the evidence that the defendant voluntarily engaged in a combat with the deceased with deadly weapons, knowing that it might or probably would produce the death either of the deceased or himself, or if, by his own wrongful act, he brought about the necessity of taking the life of deceased to prevent being killed himself, such killing will be murder in one of its degrees." This instruction is in accordance with the doctrine announced in Gilleland's case, 44 Texas, 356, and Logan's case, 17 Texas Ct. App., 50, and is correct when considered with reference to the facts of those cases. In the case before us we think the charge is erroneous. It deprives the defendant of self-defense entirely, if the killing was brought about by his wrongful act, without reference to his intent in the commission of the wrongful act. If the wrongful act was unaccompanied by any intent on the part of the defendant to kill or inflict serious bodily injury upon the deceased, or to commit any felony, such wrongful act would not deprive the defendant entirely of the right of self-defense, and would not necessarily render the homicide murder. It might be reduced to manslaughter, notwithstanding such wrongful act. Meuley v. The State, 26 Texas Ct. App., 274; Johnson v. The State, Id., 631; Bonnard v. The State, 25 Texas Ct. App., 173; Alexander v. The State, Id., 260; King v. The State, 13 Texas Ct. App., 277. Furthermore, conceding that the evidence justified a charge on the law of mutual combat, and that the instruction above quoted is, as far as it goes upon that issue, correct, still, under the facts of this case, it should have gone further, and stated that although the defendant engaged voluntarily in the combat, yet, if he did so under the influence of sudden passion arising from an adequate cause, it would not be murder, but manslaughter. Spearman v. The State, 23 Texas Ct. App., 224; Crist v. The State, 21 Texas Ct. App., 361. In other respects than those we have specified we think the charge of the court is not objectionable, and that there was no error in refusing special instructions requested.

4. It was not error to reject the proposed evidence of statements made by defendant to the witness Morel after the homicide. These statements were not *res gestæ*, but were self-serving declarations, and therefore inadmissible. The fact that under the law as it now is a de-

fendant may testify in his own behalf does not render his declarations admissible in evidence. The rules relating to declarations made by defendant have not been abrogated or in any manner changed by the statute allowing a defendant to testify in his own behalf.

Other questions presented are not discussed or determined, as they are of a nature which may not occur on another trial. For the errors discussed the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Hurt, J., absent.